IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DOUGLAS FRAZIER,<br><br>              Plaintiff,<br><br>vs.<br><br>COUNTY OF DOUGLAS, NEBRASKA, and JAY WINEINGER, in his individual and official capacity;<br><br>              Defendants. | **8:18CV160**<br><br>**MEMORANDUM AND ORDER** |

This matter is before the Court for findings and conclusions after a trial. This is an action for a violation of the plaintiff's right to be free from the use of excessive force under 42 U.S.C. § 1983, and for negligence under the Nebraska Political Subdivisions Tort Claim Act, Neb. Rev. Stat. § 13-905. Plaintiff Douglas Frazier asserts constitutional tort and negligence claims against defendant Jay Wineinger, a Douglas County Deputy Sheriff, and defendant County of Douglas, Nebraska ("Douglas County") in connection with injuries he suffered as a result of the use of a police dog to effectuate his arrest. The plaintiff's claims were tried to the Court and a jury from March 23, 2021, to March 29, 2021. The jury returned a verdict in favor of the defendants on the § 1983 claims.[1] Filing No. 200, Verdict.

---

[1] The jury had been instructed as follows:

> In determining whether the force was "excessive," you must consider: the need for the application of force; the relationship between the need and the amount of force that was used; the extent of the injury inflicted; and whether a reasonable officer on the scene, without the benefit of hindsight, would have used that much force under similar circumstances.

1

Frazier's negligence claims are before the Court for decision. Frazier contends Deputy Wineinger was negligent in deploying a canine[2] and the County was negligent in failing to properly train, supervise and monitor employees on appropriate use of force and use of canine ("K-9") units in apprehending suspects.

The defendants deny they were negligent and assert defenses of assumption of risk and contributory negligence. The following are the Court's findings of fact and conclusions of law.

**I.    Findings of Fact**

The evidence presented at trial is consistent with evidence presented in connection with earlier motion practice. *See, e.g.*, Filing No. 81, 82, 84, and 100. Further, the evidence is consistent with the facts set forth in the Court's Memorandum and Order on summary judgment motions and need not be repeated in entirety here. *See* Filing No. 137, Memorandum and Order at 2-6. The Court will accordingly cite to evidence of record when consistent with trial testimony.

The record shows that on the morning of November 4, 2015, the United States Marshals' Service Metro Area Fugitive Task Force for the District of Nebraska ("the task force" or "the officers") arrived at Frazier's residence to execute two arrest warrants.[3]

---

    You must determine whether the officer's actions were reasonable in the light of the facts and circumstances confronting the officer, without regard to the officer's own state of mind, intention or motivation.

Filing No. 204, Final Jury Instructions, Instruction No. 14.

[2] Specifically, he alleges Wineinger was negligent in failing to properly control and direct the canine, failing to exercise reasonable care and/or failing to use less-extreme measures of force in his apprehension, failing to call off the canine in a timely manner, failing to abide by established policies and procedures, failing to give proper warning, failing to timely call for medical assistance, and in taking pictures of his injuries.

[3] The task force is composed of Omaha Police Department officers, Douglas County deputy sheriffs and United States Marshals.

Filing No. 81-37, Exhibit ("Ex.") C6, Deposition of Anthony Friend ("Friend Dep.") at 7; Filing No. 81-39, Ex. C9, Deposition of Eben Jones ("Jones Dep.") at 7. Frazier was to be arrested for burglary, second degree domestic violence assault, and use of a deadly weapon (a wooden two-by-four) to commit a felony. Filing No. 81-44, Ex. C13; Filing No. 81-42, Ex. C11, Arrest Warrants.

After the officers knocked loudly on the door, Frazier barricaded the door with a wooden plank and retreated to the attic. Filing No. 81-32, Ex. C1, Deposition of Douglas E. Frazier ("Frazier Dep.") at 52. Omaha Police Department ("OPD") Officer Robert Laney, acting as a Special Deputy U.S. Marshal, testified that task force officers asked Frazier to exit the house and surrender for approximately fifteen minutes, then used a ram to breach the door to the house.

As the task force made their way into the home, Frazier's ex-girlfriend, Sarah Talbitzer, the alleged victim of the domestic assault offense set out in the warrant, came up from the basement and spoke to the officers. Officer Laney escorted Talbitzer outside and questioned her. He testified that Talbitzer informed him that Frazier had a history of methamphetamine use but she was not sure when he had last used.[4] She told Officer Laney that Frazier would likely be in the attic if he were trying to hide. She also stated that she did not know if there would be weapons in the attic.

Once in the unfinished attic, Frazier covered himself in insulation and hid. Filing No. 81-32, Ex. C1, Frazier Dep. at 85. Officer Laney testified that after entering the home and discovering that Frazier had hidden himself in the attic, the task force discussed various apprehension methods and Officer Laney, who was the case manager that day,

---

[4] Later, a blood test would show that Frazier had trace amounts of amphetamines in his body.

decided to call in a canine to assist in apprehending Frazier. It is undisputed that Deputy Jones called for a canine at 6:31:47 A.M. Deputy Jarrod ("Jay") Wineinger was assigned and dispatched at 6:31:51 A.M. and arrived at the scene at 6:46:06 A.M.

Law enforcement officers were unwilling to enter the attic for a number of reasons, including officer safety. The task force did not believe it was safe to enter the attic themselves because the warrants had been issued for violent crimes and the officers did not know if Frazier was armed. Officer Laney testified that there was a risk that one or both parties could fall from the attic into the room below if the officers and suspect were to engage in a physical confrontation in the unfinished attic. Also, Douglas County Deputy Sheriff Eben Jones testified he had experienced a suspect falling through a ceiling. The task force had unsuccessfully tried to use a pole camera to locate Frazier within the attic.

Deputy Sheriff Jones and Officer Laney also testified about less lethal means of apprehension such as OC spray[5] or other chemical irritants, tasers, batons, impact weapons, and launchers. The defendants presented evidence that OC spray and tasers would not have been effective due to the fact that the officers did not know where Frazier was located within the attic and those weapons are intended to be fired directly at a person. Filing No. 81-2, Ex. A1, Wineinger Dep. at 62. Also, Wineinger and the task force may not have had enough OC spray to fill the entire attic. *Id.* at 71. There is also evidence that Wineinger had not been trained on how to use a pepper ball gun. *Id.* at 158. There is evidence that a 40-mm launcher was available and could have been used to disburse a chemical irritant in the attic, but Deputy Jones testified that it would not have

---

[5] Deputy Sheriff Jones testified that OC spray is oleoresin capsicum, a pepper product.

4

been safe to do that. Law enforcement officers testified that some suspects have no reaction to OC products while others suffer serious adverse allergic reactions.

The record shows that Douglas County's policy for use of force requires the following criteria be considered prior to deploying a canine in a use of force situation: (1) the severity of the crime; (2) whether the suspect(s) pose an immediate threat to the safety of the officers or the public; (3) whether the suspect(s) is actively resisting arrest or attempting to evade arrest by flight; and (4) the canine handler should make every effort to ensure that the canine uses only the amount of force necessary to affect the apprehension. Filing No. 81-9, Ex. A10, Bureau Directive 420.3 at 5. Douglas County K-9 operations policy states:

> **Criminal Suspect Pursuit/Apprehension** – Before releasing his/her canine, the canine handler should have reasonable suspicion the suspect has committed a SERIOUS FELONY or VIOLENT MISDEMEANOR crime and/or is a danger to the public or law enforcement officers.
>
> . . . .
>
> 3) Canine **handlers will not use their canines to physically apprehend a subject** who obviously is not a threat, **not** able to resist **or escape**, i.e., extremely intoxicated, feeble persons, etc.

Filing No. 100-1, Ex. 4, Bureau Directive at PDF 26/108 (emphasis added).

Several officers, including Deputy Jones, testified that, before the canine deployed, multiple officers called for Frazier to surrender himself or else the K-9 would be sent into the attic. Deputy Jones stated at trial that he heard Officer Wineinger give multiple commands to Frazier to come down from the attic before the dog was sent in. All the parties agree that Frazier was told that the dog would bite him if he did not surrender. Wineinger stated that he gave at least twelve commands.

After the officers had been at the residence for thirty to forty-five minutes, Deputy Wineinger put his trained K-9 Unit, Argos, into the attic space with a command to apprehend and engage the subject. Deputy Wineinger stated that Argos did not initially engage the subject, but located him, sat, and barked, showing what is called "attention" behavior. At that point, Wineinger gave a second override command, which ordered Argos "to engage whatever he found up there whether he was moving or not." Filing No. 81-2, Ex. A1, Wineinger Dep. at 123. He stated he did so because Frazier was not being compliant, was a threat to the officers, and was in a position to resist and cause harm to the officers. *Id.* Deputy Sheriff Wineinger stated that Argos is trained to bite any part of a suspect's person that is available. *Id.* at 102-03. The undisputed evidence shows Argos bit Frazier on the face, lips, and upper neck just below the jaw. Wineinger stated that he commanded Argos to release Frazier when he heard Frazier say something along the lines of, "He's got my lip," or "He's got my face." *Id.* at 118.

Deputy Jones testified he thought the use of a canine was the best tool to use to apprehend Frazier. Former Douglas County Sheriff, Timothy F. Dunning, testified that using a canine to apprehend Frazier was reasonable under the circumstances.

Frazier testified that the attic was poorly lit, and it was difficult for him to see because of the insulation covering his face. Frazier stated he did not hear all of the calls to surrender but admits that he knew the law enforcement officers were there to apprehend him and that he knew they had a dog. He stated that he heard members of the task force ask him to surrender and heard them say at least once that they were calling a K-9 Unit to the premises. Filing No. 81-31, Ex. C1, Frazier Dep. at 96-100.

Frazier recalled being warned that the dog would bite him if he did not surrender. Id. at 116. He contends, however, that he did not fully appreciate the risk he would be bitten.

Frazier testified to the circumstances of being bitten on the face and wrist and being dragged and pulled by the dog. Id. at 117-20. After the episode, Frazier was removed from the attic and placed outside on the front steps. Several officers took pictures of his badly injured face. An ambulance, which had been put on standby earlier, arrived about ten minutes later.

Frazier was transported to the hospital and Robert Bertellotti, M.D., a burn, trauma, and critical care surgeon, treated Frazier's dog-bite wounds. Dr. Bertellotti testified by deposition at trial. He testified that Frazier's injury was "a fairly complex wound. It would be surprising if there was a single bite that caused that."

Filing No. 88-2, Ex. 6, Deposition of Robert Bertellotti, M.D. ("Bertellotti Dep.") at 11. He stated that although the injuries were not life threatening, they were "very, very severe in terms of potential functional outcomes, as well as multiple—the lacerations were through and through the full thickness of his lip and cheek, including the skin, the soft tissue, and the musculature of the mouth and face." Id. at 11. He testified to the course of Frazier's treatment, including imaging showing blood aspiration in lungs, intubation, surgery, leech therapy, antibiotics, pain-control medications, being placed in a medically induced coma for seven days, followed by speech and occupational therapy. Id. at 14-19.

The plaintiff called no expert witnesses to controvert the officers' testimony that defendant Wineinger's use of force was reasonable and appropriate.

## II. CONCLUSIONS OF LAW

A. Law

The Nebraska Political Subdivisions Tort Claims Act ("PSTCA"), Neb. Rev. Stat. § 13-901 to 13-928, "is the exclusive means by which a tort claim may be maintained against a political subdivision or its employees." *Geddes v. York Cty.*, 729 N.W.2d 661, 665 (Neb. 2007)); *see* Neb. Rev. Stat. § 13-902. The Legislature, through the PSTCA, has removed, in part, the traditional immunity of subdivisions for the negligent acts of their employees. *Doe v. Omaha Pub. Sch. Dist.*, 727 N.W.2d 447, 453 (Neb. 2007); *see* Neb. Rev. Stat. §§ 13–902; 13–903(4) (waiving sovereign immunity for negligence claims against officers in their official capacities).

The political subdivision is generally liable in the same manner and to the same extent as a private individual under like circumstances. Neb. Rev. Stat. § 13–908. A negligence action brought under the PSTCA has the same elements as a negligence action against a private individual, i.e., duty, breach of duty, causation, and damages. *Phillips v. Liberty Mut. Ins. Co.*, 876 N.W.2d 361, 369 (Neb. 2016).

When a negligence action is brought based on law enforcement making an arrest, Neb. Rev. Stat. § 28-1412 provides the applicable standard of care. *Phillips*, 876 N.W.2d at 369. "Under the provisions of § 28–1412, a police officer in making an arrest must use only reasonable force, which is that amount of force which an ordinary, prudent, and intelligent person with the knowledge and in the situation of the arresting police officer would have deemed necessary under the circumstances." *Id.* The reasonableness inquiry as to excessive force is whether the officer's actions were objectively reasonable. *Id.* Ordinarily, whether force used in making an arrest was reasonable under all the facts

8

and circumstances is a question of fact to be resolved by the factfinder. *Breese v. Newman*, 140 N.W.2d 805, 808 (Neb. 1966)..

Nebraska law consistently places the burden of proving an affirmative defense on the person utilizing the defense. *In re Est. of Loder*, 953 N.W.2d 541, 549 (Neb. 2021). A defendant may raise the issue of contributory negligence as an affirmative defense and has the burden to prove contributory negligence. *Jensen v. Archbishop Bergan Mercy Hosp.*, 459 N.W.2d 178, 183 (Neb. 1990). "Contributory negligence is conduct for which the plaintiff is responsible, amounting to a breach of the duty which the law imposes on persons to protect themselves from injury." *Foland v. Malander*, 381 N.W.2d 914, 921 (Neb. 1986)(citation omitted). "'A plaintiff is contributorily negligent if (1) the plaintiff fails to protect himself or herself from injury; (2) the plaintiff's conduct concurs and cooperates with the defendant's actionable negligence; and (3) the plaintiff's conduct contributes to the plaintiff's injuries as a proximate cause.'" *Jensen*, 459 N.W.2d at 183 (quoting *Burns v. Veterans of Foreign Wars*, 438 N.W.2d 485, 490 (Neb. 1989)).

As currently codified, "assumption of risk" as an affirmative defense means that "(1) the person knew of and understood the specific danger, (2) the person voluntarily exposed himself or herself to the danger, and (3) the person's injury or death or the harm to property occurred as a result of his or her exposure to the danger." Neb. Rev. Stat. § 25–21,185.12 (Reissue 1995). *See Jay v. Moog Automotive*, 652 N.W.2d 872, 883 (Neb. 2002). Assumption of risk differs from contributory negligence in that a subjective standard is applied to the former and an objective standard is applied to the latter. *Pleiss v. Barnes*, 619 N.W.2d 825, 829 (Neb. 2000). The doctrine of assumption of risk applies a subjective standard, geared to the individual plaintiff and his or her actual

comprehension and appreciation of the nature of the danger he or she confronts. *Burke v. McKay*, 679 N.W.2d 418, 425 (Neb. 2004).

    B.    Discussion

        1.    Deputy Wineinger.

The Court finds that the plaintiff has not sustained his burden to prove the elements of the negligence claim against Deputy Wineinger. He has not presented evidence that shows Deputy Wineinger's deployment of the canine exceeded the amount of force that "an ordinary, prudent, and intelligent person with the knowledge and in the situation of the arresting police officer would have deemed necessary under the circumstances." *See Phillips*, 876 N.W.2d at 369. The record shows that Frazier was charged with a violent crime and was known to be a methamphetamine user. The law enforcement officers all testified he was a potential danger to them. He was hiding from police, and it was unknown if he had a weapon. There was some indication that he could have been under the influence of substances that the officers knew made suspects unpredictable and erratic. He had used a two-by-four to commit an assault in the past and there were likely to be two-by-fours in the attic

Frazier hid from the law enforcement officers for over an hour. He admits that he heard members of the task force ask him to surrender, and heard, at least once, they were calling a K-9 Unit to the premises. He recalled being warned that the dog would bite him if he did not surrender.

Although the Sheriff's Office's written policy states that canines should not be used when a suspect is "obviously not a threat" or "not able to resist or escape," trial testimony of the law enforcement officers demonstrates that despite the policy's plain language, the

protocol does not apply in all circumstances. Though the severe and extensive injuries in this case are troubling, sending a canine into an enclosed space can be considered the use of lesser deadly force in some circumstances. The use of lesser deadly force as an extraction method is generally considered reasonable when the there is a threat to the safety of the arresting officers, innocent bystanders, or the suspect. Following his training and experience, it was objectively reasonable for Deputy Wineinger to believe he was justified in deploying the canine to apprehend Frazier.

Frazier suggests that a different, less-lethal means of apprehending him (OC spray, a taser, a pepper ball gun, or a 40-millimeter launcher) could have been used or that the officers could merely have waited until he surrendered. The Court credits the officers' testimony that those alternatives were unworkable or unsatisfactory for various reasons. The officers testified that waiting was not considered a realistic option because the plaintiff could have fallen through the attic and law enforcement had no idea how long the plaintiff could have held out inside the attic. The officers had prior experience with suspects falling through unfinished attic spaces either while struggling or attempting to escape. They also had experience themselves falling through unfinished attic space into the room below.

The launcher was available and could have been used, but there was evidence that that option would not have been safe. The officers testified that some suspects have no reaction to OC products while others suffer serious adverse allergic reactions. The use of chemical irritants could also have created enough activity in the attic for Frazier to have fallen through the floorboards.

11

The plaintiff failed to present any evidence, expert or otherwise, that K-9 units can be trained not to bite someone's neck or throat. There was no testimony from a qualified expert that using Argos to find and retrieve the plaintiff was not appropriate. The plaintiff failed to rebut the testimony from experienced officers that Deputy Wineinger's conduct was appropriate.

The evidence shows that Deputy Wineinger and the officers on the scene considered their options. They weighted the risks of apprehension for the plaintiff and themselves. They also considered the consequences of failing to apprehend the plaintiff. The plaintiff offered nothing to counter the officers' testimony that the deployment was reasonable. The plaintiff did not prove by a preponderance of the evidence that Deputy Wineinger negligently used his canine to apprehend the plaintiff.

2. Douglas County

There is a similar failure of proof with respect to the plaintiff's allegations against the County. The plaintiff has produced no evidence on the standard of care for training and supervision. Although the Court is concerned about the use of canines in apparent derogation of Sheriff's Office (which provides some evidence of negligence), the Court is unable to grant relief in the absence of any evidence on the standard of care for the training and supervision of dog handlers in similar circumstances.

Frazier has failed to prove the elements of his claim against the County. He has not presented evidence on the extent of the County's duty to train and/or supervise, nor can he establish that any such duty has been breached. Because the plaintiff has similarly failed to prove negligence on the part of the County's employee, the causative

connection between the County's alleged deficiencies in training and/or supervision and the plaintiff's injuries is tenuous at best.

Even if the plaintiff had met his burden to prove negligence, by the plaintiff's own admission that he heard and ignored the commands of the officers to come down from the attic, show either assumption of risk or contributory negligence sufficient to bar his recovery. The Court discredits Frazier's testimony that he did not know or understand the specific risk of danger of a dog bite when he voluntarily chose to disregard law enforcement commands and to hide himself among insulation in an unfinished attic although he was aware a canine was being called. The Court has no doubt the plaintiff did not anticipate the severity of the injury he sustained but he clearly understood he could and probably would be bitten as the result of his uncooperative conduct. Accordingly,

**IT IS ORDERED THAT:**

1. The Court finds in favor of the defendants on the plaintiff's negligence claims.
2. A separate judgment will be entered in favor of the defendants and against the plaintiff on this date.

Dated this 24th day of November 2021.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge